## Calico v. Commonwealth.

(Decided November 29, 1911.)

### Appeal from Garrard Circuit Court.

1. Murder, Indictment for—Conviction of Manslaughter—Minority of Accused—Should be Sent to House of Reform During Minority if Convicted—Duty of Court—Practice.—Where a minor defendant is convicted of a felony in the circuit court, the court, upon its own motion, should, upon proof that he is a minor, and the offense is his first, by its judgment direct his confinement in the House of Reform until he attains his majority, and if his term of imprisonment be not then ended, that he be transferred to the penitentiary until it expires.

2. Same.—If the circuit court does not take this action immediately following trial and conviction, upon defendant's motion and notice thereof to the Commonwealth, the court may at any time thereafter do so, upon satisfactory proof of minority and that the offense for which he was convicted is his first.

ROBT. HARDING, R. H. TOMLINSON for appellant.

JAMES BREATHITT, Attorney General, Theo. B. BLAKEY, Assistant Attorney General for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

This appeal is prosecuted from a judgment entered upon a verdict finding the appellant, John Calico, guilty of voluntary manslaughter; his punishment, as provided by the judgment, being confinement in the penitentiary not less than two nor more than twenty-one years. The indictment, under which appellant's conviction occurred, charged him with the murder of Irvin May. Waiving unnecessary details, the salient facts of the homicide were, that on January 18th, 1911, appellant, his twin brother, Wm. Calico, and the deceased, Irvin May, a first cousin, met at the residence of John Dailey, a brother-in-law of May. After being supplied by Dailey with several bottles of whiskey he had secured for them

at Lexington, the persons named went to the nearby village of Buckeye, appellant and May riding, each his own horse, and Wm. Calico and Dailey that of Dailey. Upon reaching Buckeye, which was about 6:30 p. m., all were considerably under the influence of the whiskey they carried from Dailey's, the deceased, May, being more intoxicated than the others. After fruitless efforts on the part of appellant and deceased to obtain at Buckeye some cartridges for a partly loaded pistol carried by appellant, appellant, his brother and Dailey concluded to attend a party at the home of one Rufus Sebastion. Deceased objected to going, but left Buckeye with them. They went perhaps a mile and met two men by the name of Hurt with whom they had some conversation, following which they returned to Buckeye. While riding along the road appellant was asked by deceased for some whiskey which he gave him. Appellant then said to deceased "Now, Irvin, you treat the other boys." Deceased thereupon handed appellant an empty bottle and the latter said to him: "There is nothing in this bottle, you have more, I never refused you whiskey." Deceased then put the empty bottle back in his pocket, saying as he did so: "G—d d—n you, I haven't any whiskey; you boys promised to stay with me and now you are going to that party and leave me."

This conversation occurred near the village courthouse and Dailey hearing what was said and desiring to get deceased in his drunken condition to his home, said to him: "You come and go home with me and we will not go to the party," at the same time taking deceased's horse by the bridle and leading him in the direction of home. After going a little distance deceased attempted to turn his horse around and said, in substance, he would not go · home, but go where he pleased. Thereupon Dailey released the bridle and deceased, accompanied by Dailey, returned to where appellant and his brother were standing near their horses. Dismounting from his horse and hitching him to the fence, deceased staggered toward appellant with his right hand in his pocket and the left hanging by his side. As he approached appellant the latter had his pistol in his hand. Down to this point there was no conflict in the evidence. But there was a disagreement between the witnesses for the Commonwealth, and appellant and his brother, as to what followed. Appellant testified that after getting off his his horse deceased advanced upon him with an open

knife in his hand, saying: "G—d d—n you, John, I am going to kill you;" that he (appellant) then said to deceased, "Don't come on me," or "stand back," but that the latter continued to advance and appellant then shot at him; the pistol, however, was knocked up by Wm. Calico or Dailey, and the bullet missed deceased; that appellant then shot at deceased the second time, and the bullet entering his head, quickly produced death.

Wm. Calico corroborated appellant's testimony, except that he did not see a knife in deceased's hand until the second shot was fired. He also testified that after the first shot deceased seemed about to step behind or go around appellant's horse.

The testimony of John Dailey, for the Commonwealth, presented a wholly different account of the shooting. It was to the effect that after hitching his horse, deceased advanced to within eight or ten feet of appellant, who, with pistol in hand, told him to stop, which command deceased obeyed, but that appellant nevertheless quickly stepped or jumped toward deceased, and shot at him, without hitting him, as his hand was knocked up; that deceased then turned to run, got twelve or fifteen feet away and started behind appellant's horse, saying as he did so: "Boys, don't let him do that no more." As he made this request appellant shot at him again and deceased at once fell to the ground and did not arise or make any effort to do so. Dailey also stated that deceased had his right hand in his pocket until he turned to run, after the first shot from appellant's pistol, and that he did not see a knife in his hand, nor did he hear him say "G—d d—n you, John, I am going to kill you." The physician and others who got to deceased after he was shot, found an open pocket knife under his body, on the left side between his coat and the hip pocket of his pants.

According to the further testimony of Dailey the horses, except that of deceased, which was hitched, became frightened by the shooting and after the second shot ran down the pike, and he, appellant, and Wm. Calico, ran after the horses and soon caught them; that upon reaching the horses, and again after they had ridden some distance, Dailey and Wm. Calico, in appellant's presence, consulted as to whether they should report to somebody the shooting of deceased, Wm. Calico advising that it be not done, and appellant saying nothing. Dailey, however, thought it should be done and they final-

ly informed his brother of the shooting. While thus consulting he and Wm. Calico, or both of them, for the purpose of putting appellant at his ease, expressed the opinion that he had not shot deceased at all, but appellant at once refused to accept the suggestion, saying, "Boys, I don't see how I missed him, for I held it right on him."

John Bogie, to whose fence deceased hitched his horse just before he was shot, corroborated Dailey in several important particulars, as he testified that his attention was attracted to appellant, his brother, Dailey and the deceased, immediately before the shooting by their loud talking, though he did not at the time recognize them or understand much of what they said; that he saw two of them dismount from their horses in front of the courthouse, walk twenty feet from them and remain standing; that two other men, one of them on a horse, who had apparently just before left these two and gone down the pike, returned to them; that some one said: "John, come back, come back," and the man on the horse dismounted, hitched him to the fence, started away from him and had gotten about half way to where the first two men were standing, when a pistol was fired; that following this shot he (Bogie) heard a voice say, "Don't let him do that boys," and immediately after this appeal a second shot was fired, after which all the men, save the one who had hitched his horse to the fence, went off up the pike. The witness then went to where the shooting occurred and there saw deceased lying on the ground. He then went into the house, told his wife what he had seen and later went to the scene of the killing with others.

In addition to the testimony of Dailey and Bogie, the character of the wound received by the deceased furnished conclusive proof that he was not facing or advancing upon appellant at the time the latter shot him, for the bullet entered his head behind the right ear and came out behind the other ear. This shows that deceased was, as stated by Dailey, and in part admitted by Wm. Calico, moving away from appellant and trying to get out of the range of his pistol by placing the latter's horse between him and the weapon and that he was shot as he turned his side and back to appellant in order to get behind the horse.

The foregoing facts leave little room for appellant's contention that the shooting of deceased was excusable on the ground of self-defense. Whatever may have been his purpose in advancing upon appellant, even with a

knife in his hand, it was manifest that the first and harmless shot from the pistol thwarted that purpose and caused its abandonment, which was bound to have been known to appellant when and before he fired the second and fatal shot, for he saw the attempt of deceased to escape following the first shot, and heard his appeal to Dailey and Wm. Calico for protection. In view of the evidence, we are unable to see that appellant could have expected a verdict of acquittal. At most, he can fairly claim no more than that the language and conduct of the deceased, immediately preceding the killing, provoked him to sudden heat and passion under the impulse of which he shot and killed him, and such was the view of the matter taken by the jury.

We do not think the instructions open to all the objections urged to them by appellant's counsel. That some of them do not aptly state the law is self-evident. Few instructions are expressed in such language as would be employed by a court of review, if it were charged with the duty of preparing them, but the reversal of a judgment of conviction in a criminal case will not be granted for errors in instructions, unless they are of such a character as to prejudice the substantial rights of the defendant.

Tested by this rule the instructions in this case were not prejudicial. While those as to the law of murder and voluntary manslaughter, omit any reference to appellant's right to act in his necessary, or apparently necessary self-defense, as the separate instruction on the law of self-defense properly sets forth the circumstances under which appellant could legally exercise that right, the omission in the first two instructions referred to, could not have misled the jury.

Appellant's complaint of the admission by the trial court of incompetent evidence, has reference to conversations between Dailey and Wm. Calico in the presence and hearing of appellant, immediately after the shooting of deceased by appellant, in which they were debating whether they should give information to others of the shooting. There is doubt as to the competency of some parts of these conversations, but their admission was not prejudicial. The object of the Commonwealth in introducing these conversations was to show an attempt on the part of Dailey and Wm. Calico, with appellant's acquiescence, to conceal the responsibility of the latter for the death of deceased, but in point of fact they did

not accomplish this object. While the conversations did manifest some hesitancy at first on the part of Dailey and Wm. Calico to give notice of the homicide, the discussion ended in their giving such information and also information that appellant killed him.

Appellant also complains that the Commonwealth's Attorney was guilty of misconduct on the trial, consisting of his persistency in asking incompetent questions on the cross-examination of appellant, and statements made in argument to the jury. The questions asked of appellant were as to his commission of other offenses. There were but two or three of these questions asked; these the court ruled out when objected to by appellant's counsel, and appellant was not permitted to answer them. The Commonwealth's attorney was not unduly persistent, and did not repeat the questions after the court held them incompetent. It is not apparent that he was acting in bad faith, or perceived that appellant was in any way prejudiced by his conduct.

What the Commonwealth's Attorney said in argument to the jury is included in the following statement:

"I want you (the jury) not only to give me your attention, but want you to look me in the eye, so that I may know you catch what I say. The law must be enforced and offenders punished for these purposes; one for the protection of society, another to deter others from committing crime, and another to save the taxpayer from costs incurred in prosecutions like this."

When appellant's counsel objected to the above statement, the court promptly rebuked the Commonwealth's Attorney for making it and told the jury to disregard it. We are unable to see what more could have been done by the court. In our opinion the only thing of doubtful propriety said by the Commonwealth's attorney was as to the matter of costs incurred in prosecutions, and obviously that was not of sufficient seriousness, even if the court had not told the jury to disregard it, to constitute reversible error. All else said by the Commonwealth's attorney was legitimate. Attorneys should be allowed reasonable latitude in their arguments to the jury, and also allowed to adopt their own methods of attracting the attention of the jury and presenting their arguments, provided they keep within the record and observe the decorum that should obtain in courts of justice.

Appellant also complains that the court erred in refusing him a new trial on the ground of newly-discovered

evidence. No good reason is shown why the alleged newly-discovered evidence was not discovered before, or during appellant's trial. As the witnesses were then accessible and known to appellant, it is apparent that the facts claimed to be in their possession might, by the exercise of reasonable diligence on his part, have been ascertained before and used on the trial. The newly-discovered evidence is as to statements said to have been made by the witness, Bogie, at the coroner's inquest, and which appear to be contradictory of some of his testimony given on appellant's trial. Many of the alleged contradictions are upon immaterial matters, and moreover, some of them were proven by other witnesses on appellant's trial. The newly-discovered evidence would, therefore, be cumulative, as well as largely immaterial. Besides, it is further apparent that it would not, upon another trial of the case, have a preponderating influence in its decision. A new trial will not be granted on the ground of newly-discovered evidence, though reasonable diligence would not have procured it for the first trial, where it is made to appear that the newly-discovered evidence is merely cumulative, or that its only effect would be to contradict witnesses whose testimony was given on the first trial.

Appellant's final complaint is that as he is under twenty-one years of age the trial court erred in adjudging that he be confined in the penitentiary, instead of the House of Reform, as provided by sub-section 19a, section 2095a, Kentucky Statutes. The attention of the trial court was not called to this dereliction of duty on its part and it is here complained of for the first time. In Washington v. Commonwealth, 143 Ky., 602, we held that the provision of the statute, supra, requiring confinement in the House of Reform of minor offenders is mandatory, and that where it is made to appear that one convicted of a felony, "is twenty-one years of age or under," and the offense of which he is convicted is his first, the trial court is without power to refuse him confinement in the House of Reform.

The opinion in that case further holds, however, that the questions whether the offender is a minor, and whether the offense is his first, are matters addressed to the court and to be determined by it either upon or after the trial. For this reason a reversal of the judgment of conviction was refused, but the case was remanded for the circuit court to ascertain whether the offender in that

case was a minor, and whether the offense of which she was convicted was her first offense. The opinion also directed that if it was made to appear to the satisfaction of the circuit court that the appellant was "twenty years of age, or under," and the offense was her first, it should make an order directing that she be transferred to the House of Reform, there to be detained until she reached her majority, and then returned to the penitentiary to serve out the remainder of her term of imprisonment.

We adhere to the rule of procedure announced in Washington v. Commonwealth, supra, and would add, that where a minor defendant is convicted of a felony in the circuit court, the court, upon its own motion, should, upon proof that he is a minor and the offense his first, by its judgment direct his confinement in the House of Reform until he attains his majority, and if his term of punishment for the felony be not then ended, that he be transferred to the penitentiary until it expires.

If, however, the circuit court does not take this action immediately following the trial and conviction of the minor, it may at any time thereafter during his minority, and upon his motion and notice thereof to the Commonwealth, do so, upon satisfactory proof of his minority and of the offense for which he was convicted being his first.

The evidence in the case at bar shows appellant's age to be 19 years. There was also abundant proof that his character was bad, but none that the killing of deceased was his first offense. He may, therefore, at any time during his minority, by motion and notice thereof to the Commonwealth Attorney, and by proof of his minority and that the offense in question was his first, obtain of the circuit court an order transferring him to the House of Reform until his majority is reached, but the order must also direct that he then be returned to the penitentiary to be confined as provided by the original judgment.

Appellant having shown no cause for disturbing the verdict, the judgment is affirmed.